AD HOC METALS COALITION,
Plaintiff,

v.

Christine Todd WHITMAN, Administrator, and United States Environmental Protection Agency, Defendants.

National Federation of Independent Business, Plaintiff,

v.

Christine Todd Whitman, Administrator, and United States Environmental Protection Agency, Defendants.

Nos. CIV.A.01–0766(PLF),
CIV.A.01–0900(PLF).

United States District Court,
District of Columbia.

Sept. 26, 2002.

Jane Charlotte Luxton, King & Spalding, Washington, DC, for plaintiff.

Angeline Purdy, Eileen T. McDonough, U.S. Dept. of Justice, Environmental Defense Section, Washington, DC, for defendants.

## OPINION

PAUL L. FRIEDMAN, District Judge.

Plaintiffs Ad Hoc Metals Coalition and National Federation of Independent Business brought these actions pursuant to the Administrative Procedure Act, 5 U.S.C. § 702, seeking judicial review of a final rule promulgated by the Environmental Protection Agency that lowered the reporting thresholds for lead and lead compounds. The Court has before it a motion by plaintiffs to supplement the administrative record with extra-record documents, alleging that the record certified by EPA on August 31, 2001 is an incomplete record on the rule at issue.

## I. BACKGROUND

Under the Emergency Planning and Community Right–to–Know Act ("EP-

CRA"), 42 U.S.C. §§ 11001 *et seq.*, owners and operators of facilities that manufacture, process or otherwise use toxic chemicals in amounts exceeding established threshold levels must submit annual reports to EPA. These reports provide information on the usage, storage, environmental dispersal and disposal of these chemicals. 42 U.S.C. § 11023(g). EPCRA also required the creation of the Toxic Release Inventory ("TRI"), a publicly accessible computer database containing information extracted from the annual reports, to allow the public and governmental entities to track and compare chemical usage and storage throughout the United States so as to determine whether there is a need to reduce or eliminate the use and release of the chemicals. *See* 59 Fed.Reg. 1788; Defendants' Opposition to Plaintiff's Motion to Supplement at 4 ("Def.Opp.").

On January 5, 1999, EPA announced a proposal to make certain additional persistent, bioaccumulative, toxic chemicals ("PBT chemicals") reportable under EPCRA and to lower the reporting thresholds for a number of PBT chemicals ("PBT Rule"). *See* 64 Fed.Reg. 688 (Jan. 5, 1999). Before finalizing the proposed PBT Rule, EPA issued a separate proposed rule—the TRI lead rule at issue in the case before the Court—suggesting a reporting threshold of just 10 pounds per year for lead and lead compounds. *See* 64 Fed.Reg. 42,222 (Aug. 3, 1999). In accordance with the Administrative Procedure Act, EPA published the proposed TRI lead rule in the Federal Register and solicited comments on the issue. *See* 5 U.S.C. § 553(4)(b-c); Def. Opp. at 5. The comment period was extended twice, finally ending on December 16, 1999, after the receipt of over 800 comments. *See* Def. Opp. at 5. Although EPA received many comments questioning its scientific methodologies, the final rule, which set the reporting threshold for lead at 100 pounds

per year (up from the originally proposed 10 pounds per year), was promulgated on January 17, 2001. *See* 66 Fed.Reg. 4500 (Jan. 17, 2001). This new threshold reflected a significant decrease from the existing standards set under EPCRA, which set reporting amounts at 25,000 pounds per year for those manufacturing or processing lead or lead compounds and 10,000 pounds per year for those using lead or lead compounds. *See* 42 U.S.C. § 11023(f)(1). EPA justified the change on the ground that "lead and lead compounds are PBT [persistent, bioaccumulative, toxic] chemicals." 66 Fed.Reg. at 4501.

On April 10, 2001, Ad Hoc Metals Coalition ("Ad Hoc Metals" or the "Coalition"), a coalition of trade associations whose members will be required to comply with the new rule, filed this challenge to the TRI lead rule. National Federation of Independent Business ("NFIB"), a small business lobbying group, filed its complaint on April 27, 2001. The cases subsequently were consolidated. EPA filed its certified administrative record on August 31, 2001, and plaintiffs filed their motion to supplement the administrative record on November 30, 2001.

## II. DISCUSSION

### A. Standard of Review

In cases brought under the APA, the Court's review is confined to the administrative record. *See Community for Creative Non–Violence v. Lujan,* 908 F.2d 992, 997 (D.C.Cir.1990); *Edison Elec. Inst. v. OSHA,* 849 F.2d 611, 617–18 (D.C.Cir. 1988). Review of agency action "is to be based on the full administrative record that was before the [agency] at the time [it] made [its] decision." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136

(1971). *See James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1095 (D.C.Cir.1996) ("The administrative record includes all materials 'compiled' by the agency . . . that were before the agency at the time the decision was made.") (internal quotation marks and citations omitted). In certain limited circumstances, however, a court may permit supplementation of the administrative record when such supplementation is necessary to provide a fuller explanation of the agency's decision. *See, e.g., James Madison Ltd. v. Ludwig*, 82 F.3d at 1095; *Beach Communications, Inc. v. FCC*, 959 F.2d 975, 987 (D.C.Cir. 1992); *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C.Cir.1989); *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C.Cir.1984). In conducting a thorough review, a court also may find it necessary to consider explanations regarding the state of the original record and decision, although it may not entertain *post hoc* rationalizations where no rationale was set forth before. *See Carlton v. Babbitt*, 900 F.Supp. 526, 531 (D.D.C.1995). Supplementation of the administrative record has been found to be appropriate, *inter alia*, when "the agency failed to consider factors which are relevant to its final decision" or when "an agency considered evidence which it failed to include in the record." *Esch v. Yeutter*, 876 F.2d at 991.[1]

### B. Analysis

Plaintiffs seek to supplement the administrative record with three categories of documents: (1) documents contained in the public docket for the TRI lead rule but omitted by EPA in the certified index, principally the transcript of a professional workshop held on January 19, 2000 and sponsored in part by EPA; (2) documents prepared by other government agencies as part of the required interagency review of the TRI lead rule; and (3) internal EPA communications disclosed by EPA in response to plaintiffs' Freedom of Information Act request. According to plaintiffs, EPA's purposeful omission of these documents—documents adverse to EPA's rulemaking decision with respect to the TRI lead rule—leaves the Court with a one-sided and incomplete record. *See* Plaintiffs' Motion to Supplement Administrative Record at 9 ("Pl.Mot."). Plaintiffs contend that because these documents were an "integral part of the rulemaking," they should be added to the administrative record to "ensure a full and fair review." *Id.* at 3.

In response, defendants argue that the administrative record is complete and that there is no need to supplement it with documents critical of the TRI lead rule because the record is replete with documents criticizing EPA's position and the scientific bases for the TRI lead rule. *See* Def. Opp. at 2. In addition, defendants contend that without evidence from plaintiffs that EPA in fact relied on the documents at issue, there is no need to supplement the record when it already contains ample documentation of EPA's reasons for acting as it did. *Id.* at 11–12. The Court finds that EPA in fact did consider several of the documents that plaintiffs have identified and that the record should be supplemented to add certain documents incorrectly omitted from the administrative record. Plaintiffs' motion to supple-

---

1. A court also occasionally may permit discovery, but only in two limited circumstances: (1) when there is a "strong showing of bad faith or improper behavior," or (2) when discovery provides "the only possibility for effective judicial review and when there have been no contemporaneous administrative findings." *Community for Creative Non–Violence v. Lujan*, 908 F.2d at 997 (citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. at 420, 91 S.Ct. 814). *See also Commercial Drapery Contractors, Inc. v. United States*, 133 F.3d 1, 7 (D.C.Cir.1998).

ment therefore will be granted in part and denied in part.

### 1. Category I Documents (Public Docket Documents)

█ The first category of documents consists of (1) a transcript of the "Experts Workshop" and an accompanying cover letter from the workshop co-sponsors asking that the transcript be published for public comment and that EPA consider the transcript in its TRI lead rulemaking; (2) thirteen letters from industry representatives urging the same; and (3) comments submitted on December 5, 2000 memorializing an August 23, 2000 presentation to EPA regarding PBT effects on human health by Dr. Craig Boreiko of the International Lead Management Center, Dr. William Adams of Kennecott Utah Copper Corporation, and Jane Luxton of King & Spalding representing the Lead Industries Association ("LIA"). While plaintiffs acknowledge that all of these documents were submitted to EPA after the close of the comment period, they contend that EPA considered the information contained in these documents prior to promulgating the TRI lead rule and that EPA therefore may not exclude them from the administrative record. Pl. Mot. at 13–18. *See Personal Watercraft Indus. Ass'n v. Dep't of Commerce*, 48 F.3d 540, 543 (D.C.Cir. 1995); *Esch v. Yeutter*, 876 F.2d at 991. The Court agrees that the transcript of the "Experts Workshop" and the December 5 letter and comments submitted in relation to the August 23, 2000 meeting should be added to the administrative record. It disagrees with respect to the other documents.

#### a. The Transcript and Accompanying Industry Letters

On January 19, 2000, roughly a month after the close of the TRI lead rule public comment period, EPA's Office of Solid Waste co-sponsored a conference entitled "Experts Workshop."[2] The workshop provided a forum in which representatives and scientists from EPA, academia and interested industries could discuss the state-of-the-science surrounding application of current PBT methodologies to metals.[3] On April 4, 2000, plaintiffs submitted the transcript of the workshop and a cover letter to EPA for its consideration.

Plaintiffs contend that the transcript, reflecting the detailed scientific and technical presentations made at the workshop, reveals the flaws in EPA's scientific justification for the TRI lead rule. Pl. Mot. at 12. Proof of EPA's disregard of these contrary scientific opinions, plaintiffs argue, goes to the heart of establishing the Agency's action as arbitrary and capricious. *Id.* Defendants respond that the transcript was not relied upon by EPA during its decisionmaking and is merely cumulative of materials submitted by other organizations

---

2. The co-sponsors included EPA's Office of Solid Waste, the Electric Power Research Institute, the International Copper Association, the International Lead Zinc Research Organization, and the Nickel Producers Environmental Research Association.

3. During the public comment period, EPA received comments questioning the PBT methodology employed in evaluating the potential hazards of metals and inorganic metal compounds. Specifically, plaintiffs and others argued that because the PBT methodology was developed to analyze synthetic organic chemicals, it cannot properly be applied to lead. *See* Def. Opp., Exhibit A, December 16, 1999 Letter from Jane Luxton to Document Control Office, Office of Pollution Prevention and Toxics, EPA ("Doc. Control Off.") ("Def.Ex."); Def. Ex. B, October 21, 1999 Letter from Kevin Brix to Doc. Control Off.; Def. Ex. D, December 16, 1999 Letter from Krishna Parameswaran to Doc. Control Off.; Def. Ex. F, December 15, 1999 Letter from Richard Lawson to Doc. Control Off.

during the comment period. Def. Opp. at 12, 18. Alternatively, defendants argue that inclusion of late-filed comments are subject to agency discretion. *Id.* at 16.

The Experts Workshop was held just one month after the formal comment period ended—and almost a year to the day before the final rule was issued. EPA not only cosponsored the workshop, but also was the main impetus behind the meeting. *See* Pl. Mot., Exhibit C1, April 4, 2000 Letter from Neil King to Doc. Control Off. and attached Transcript of January 19, 2000 Experts Workshop at 7 ("Transcript") ("Pl.Ex."). EPA's primary goals in holding the workshop were to "identify and discuss concerns about the application of PBT criteria to metals and inorganic metal compounds" and to address the "policy implications of the existing scientific evidence." *Id.* at 8. TRI program members from EPA spoke at the workshop about EPA's rulemaking and specifically about the applicability of the PBT methodology. *See id.* at 46–48. As presenters and attendees, these EPA officials were in a position to hear and consider arguments for and against the basis of the TRI lead rule. In addition, numerous TRI officials received electronic message summaries discussing the PBT-related issues sparked by the workshop discussions. *See* Pl.Ex. J1–5, 8, 10, 20 (internal EPA e-mails illustrating that TRI lead rulemakers considered issues raised by the transcript even though much of the conference failed to relate specifically to lead). There can be little doubt that the transcript of the Experts Workshop reflected scientific views adverse to those of EPA and was known to and—the evidence strongly suggests—was considered by EPA at the time it issued the final rule. Because the Workshop and

the transcript of its proceedings were directly related to the issue decided in the final rule, because the workshop was cosponsored by EPA and held only shortly after the formal comment period ended, and because the transcript was adverse to the agency's position, supplementation of the administrative record is appropriate.[4]

▪ The transcript will not be excluded simply because defendants claim that they did not "rely" upon it. EPA acknowledges that it reviewed the transcript, and internal documents indicate EPA's concern over the issues raised and comments made at the Experts Workshop. *See* Pl.Ex. J1–5, 8, 10, 20. To the extent that EPA relies on fine distinctions between the phrase "relied upon" and the word "considered," its argument is without merit. A clear definition of "considered" is noticeably absent from the case law, and "considered" and "relied upon" are used almost interchangeably. *See Bar MK Ranches v. Yuetter*, 994 F.2d 735, 739 (10th Cir.1993) ("the administrative record consists of all documents and materials directly or indirectly considered by the agency."). The Experts Workshop transcript, having been referred to, considered by, or used by EPA before it issued its final rule must be included in the administrative record, particularly given the adverse nature of its contents. *See Walter O. Boswell Mem'l Hospital v. Heckler*, 749 F.2d at 792 (reviewing less than full administrative record would allow agency to withhold evidence adverse to its position); *Envtl. Defense Fund v. Blum*, 458 F.Supp. 650, 661 (D.D.C.1978) (agencies may not skew the record by excluding information that has

---

4. This Court sees no reason to decline supplementation simply because the additional information might be cumulative. EPA's reliance on an already robust record does not

negate the fact the transcript was considered and is necessary to complete the record. *See Esch v. Yeutter*, 876 F.2d at 991; *Carlton v. Babbitt*, 26 F.Supp.2d 102, 107 (D.D.C.1998).

"great pertinence" to the proceedings).[5]

This Court rejects defendants' position that late-filed comments always can be ignored for purposes of the administrative record. While the comment period must end at some point, where highly relevant information comes to light one month later because of an agency's own initiative, prior to promulgation of a final rule and with a sufficient amount of time remaining that the ultimate decision can be influenced, this Court believes that such information should be included in the record.

As for the cover letter accompanying the transcript of the Experts Workshop and the thirteen letters from industry representatives urging consideration of the transcript, this Court finds them devoid of any relevant, substantive material. They appear to be cookie-cutter requests for consideration of the transcript and utterly lacking in relevant scientific content. The relevant information is contained only in the transcript itself. The Court therefore denies plaintiffs' request with respect to these letters.

  b.  December 5, 2000 Submission
      Relating to August 23, 2000
      Presentation

On August 23, 2000, some eight months after the close of the comment period, during the period of interagency review and over four months prior to issuance of the final TRI lead rule, officials from EPA held a meeting with several industry representatives to discuss application of PBT criteria to metals, as well as the concerns of industry representatives regarding "PBT methodologies with respect to quantifying effects on aquatic organisms and human health." Pl. Mot. at 17.[6] On December 5, 2000, little more than a month before final promulgation of the TRI lead rule, Jane Luxton of King & Spalding, which represents the Lead Industries Association, submitted a letter with attached comments highlighting many of the issues discussed at the August meeting. *See id.;* Pl.Ex. C15, December 5, 2000 Letter from Jane Luxton to Doc. Control Off. and attached "Comments of Craig J. Boreiko, PhD, International Lead Management Center, August 23, 2000." Plaintiffs seek to supplement the record with the December 5, 2000 comments, which they suggest were submitted as a "counterpart filing of the presentations at [the August 23, 2000] meeting" in order to ensure that the presentation was recorded in the administrative record. *See* Pl. Mot. at 17.

With respect to the August meeting and Ms. Luxton's follow-up submission in December, defendants contend that neither plaintiffs nor "any other commenter" criti-

---

**5.** Contrary to defendants' contention, a showing of bad faith or improper behavior is not required for a court to supplement the record. *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. at 420, 91 S.Ct. 814 (making clear that this showing applies only to instances where the method of supplementation involves testimony inquiring into the mental processes of administrative decisionmakers); *see also James Madison Limited v. Ludwig,* 82 F.3d at 1095; *Esch v. Yeutter,* 876 F.2d at 991; *Beach Communications, Inc. v. FCC,* 959 F.2d at 987; *Walter O. Boswell Mem'l Hospital v. Heckler,* 749 F.2d at 791–92.

**6.** Industry representatives in attendance included: Dr. Craig Boreiko, International Lead Management Center; Dr. William Adams, Kennecott Utah Copper Corp.; Jane Luxton, King & Spalding counsel representing the Lead Industries Association. EPA officials present were: Elaine Stanely, Director of the Office of Information Analysis and Access; Daniel Bushman, TRI Petitions Coordinator; Amber Aranda, Office of the General Counsel; Jane Henriques, Special Assistant to the Administrator. Also at the meeting were officials from the Office of Management and Budget, the Office of Science and Technology Policy and the Small Business Administration.

cized EPA's human health data during the comment period. As a result, they say, these untimely comments were correctly excluded from the administrative record. Def. Opp. at 19. Defendants further argue that the comments were excluded from the record because the comments presented "neither relevant, nor significant new issues" that warranted consideration. *Id.*

As the Court has stated, the late submission of comments does not always justify their exclusion from the administrative record. Here, EPA attended a meeting hosted in August by the Office of Management and Budget directly relating to the TRI lead rule during the period of interagency review and several months prior to issuance of the final rule. *See* Def. Opp. at 19. Industry representatives at the meeting raised concerns about the human health data relied upon by EPA in formulating the TRI lead rule and those same concerns were memorialized in the Luxton letter and Boreiko comments. EPA later responded to those concerns in a memorandum to the docket supporting the TRI lead rulemaking. *See* Pl.Ex. E, Memorandum from Stephen C. DeVito, TRI to OPPTS Docket, February 21, 2001, at 1–2 ("DeVito Memo"). Whatever EPA's ultimate evaluation of the concerns raised at the August 23, 2000 meeting and reiterated in December, the Court finds it reasonable to conclude that EPA considered these issues during the period of interagency review, prior to issuance of the final rule. While EPA's memorandum to the docket is addressed only to the December 5, 2000 submission and states that it was developed solely "for information purposes," the December comments attached to Ms. Luxton's letter were made by the same parties present at the August 23 meeting and raised the same concerns regarding human health data underlying the TRI lead rule. *See* DeVito Memo at 1–2. EPA's memorandum to the docket there-

fore can be seen as a direct response to the August 23, 2000 meeting.

In addition, e-mails exchanged among EPA officials demonstrate that EPA did consider (albeit negatively) the concerns raised at the August 23 meeting and in the December 5 letter and comments prior to issuance of the final TRI lead rule. *See, e.g.,* Pl.Ex. F, December 7, 2000 E-mail from Daniel Bushman to Maria Doa, *et al.*, (forwarding "some responses to the issues that Dr. Boreiko [of the International Lead Management Center, an industry group] raised concerning human bioaccumulation of lead at the OMB/Industry meeting back in August."). Furthermore, the Court notes that EPA included in the administrative record materials from its post-comment period meeting with U.S. PIRG, a public interest research group. Inclusion of those materials cannot be reconciled with EPA's retrial to include the December 5 letter and comments related to its August meeting with plaintiffs. *See* Pl. Mot. at 17; Def. Opp. at 18.

■ Because the comments made at the August 23, 2000 meeting were considered by EPA officials prior to issuance of the final TRI lead rule, and because analogous materials from a similar meeting were included in the record, the Court finds that the comments submitted at the August 23, 2000 meeting, as memorialized in the follow-up submissions by Jane Luxton and Craig Boreiko on December 5, 2000, should be added to the administrative record. *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. at 420, 91 S.Ct. 814; *Esch v. Yeutter,* 876 F.2d 976, 991 (supplementation appropriate when "an agency considered evidence which it failed to include in the record").

### 2. Category II Documents (Government Agency Documents)

In accordance with Executive Order 12866, EPA submitted its proposed TRI

lead rule for inter-agency review before promulgation of the final rule.[7] Plaintiffs claim that the application of PBT criteria to metals was a "critical" issue in the inter-agency review, but that all the documentation relating to these matters has been omitted from the administrative record. *See* Pl. Mot. at 21. Plaintiffs assert that defendants excluded these relevant inter-agency documents solely because they are adverse to EPA's position. *Id.* at 22. Defendants counter that the documents exchanged during the inter-agency review added no new factual material to the debate. Def. Opp. at 25, 26.

This Court sees no justification for including the majority of these documents because, as plaintiffs' own motion reflects, EPA did include a number of documents bearing striking similarities to those excluded. *See* Pl. Mot. at 22–23. While plaintiffs demand inclusion of these documents because their exclusion implicates arbitrary action, mere exclusion of relevant documents does not necessarily require supplementation of the record. *See Carlton v. Babbitt,* 26 F.Supp.2d at 107–08. Where an agency has considered an issue and included relevant material in the record, supplementation with similar or identical documents is not always required. *See id.* Here, plaintiffs have failed to present any evidence that different opinions were offered or different issues were raised in the excluded documents.

Indeed, plaintiffs openly admit that the documents are "identical in nature" to those already in the record. Pl. Mot. at 22.

This Court, however, will supplement the record with one document from Category II, namely a report by the General Accounting Office entitled: *Regulatory Flexibility Act: Implementation in EPA Program Offices and Proposed Lead Rule.* Pl.Ex. G18.[8] This publicly available report, which addresses certain economic issues pertaining to the lead rule, responds directly to an EPA request for review of surrounding issues. *Id.* at 1. Publicly available reports, especially those relating to relevant issues and drafted as a result of an agency request, should be considered by the agency and therefore should be included in the administrative record. *See Carlton v. Babbitt,* 26 F.Supp.2d at 107. In any event, defendants do not object to the inclusion of this report. *See* Def. Opp. at 14.

### 3. Category III Documents (Internal Agency Documents)

Plaintiffs also seek to supplement the record with a number of internal EPA e-mails exchanged throughout the lead rule-making process. Most of these e-mails were sent and received after the close of the comment period but prior to promulgation of the final rule. Because these e-mails were considered by EPA and are adverse to the final rule, plaintiffs assert

7. Agencies participating in the interagency review included the Office of Management and Budget, the Office of Science and Technology Policy, the Department of Energy, and the Small Business Administration. In addition, scientists from the National Science Foundation and the U.S. Geological Survey also commented on the proposed rule. *See* Pl. Mot. at 19–20.

8. Although plaintiffs refer to the GAO report as one of the "documents generated and considered as part of the interagency review of

the draft final rule," Pl. Mot. at 19, plaintiffs do not include the GAO within the list of agencies participating in that interagency review. *See id.* at 20. Despite this omission, however, the GAO report itself states that it was drafted in response to an EPA request for consultation on issues surrounding the TRI lead rule. *See* Pl.Ex. G18 at 1. The Court therefore will consider the report as a document "generated and considered as part of the interagency review of the draft final rule." Pl. Mot. at 19.

that inclusion is justified. *See* Pl. Mot. at 23–24. Defendants argue that inclusion of these internal discussions runs counter to the case law holding that the administrative record should not include or be supplemented by deliberative materials. *See* Def. Opp. at 20–21.

■■■ Judicial review of agency action should be based on an agency's stated justifications, not the predecisional process that led up to the final, articulated decision. *See PLMRS Narrowband Corp. v. FCC,* 182 F.3d 995, 1001 (D.C.Cir.1999); *LO Shippers Action Committee v. Interstate Commerce Commission,* 857 F.2d 802, 805–06 (D.C.Cir.1988); *Kansas State Network, Inc. v. Fed. Communications Comm'n,* 720 F.2d 185, 191 (D.C.Cir.1983). To require the inclusion in an agency record of documents reflecting internal agency deliberations could hinder candid and creative exchanges regarding proposed decisions and alternatives, which might, because of the chilling effect on open discussion within agencies, lead to an overall decrease in the quality of decisions. *See San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n,* 751 F.2d 1287, 1326 (D.C.Cir.1984); *cf. Jordan v. United States Dept. of Justice,* 591 F.2d 753, 772 (D.C.Cir.1978) (internal agency communications protected from disclosure

under Freedom of Information Act to "protect[ ] creative debate and candid consideration of alternatives within agency."). Inclusion of such internal discussion also might cause confusion in the public sphere if everyone had access to internal discussions before agency issues were settled. *See Jordan v. United States Dept. of Justice,* 591 F.2d at 772. By maintaining the confidentiality of pre-decisional internal opinions and discussions, the policy of non-disclosure "protect[s] the integrity of the decisionmaking process" and ensures that agency actions are judged based on what was decided, not on what was considered. *Id.* The Court will not supplement the record with these e-mails.[9]

### III. CONCLUSION

For all of these reasons, this Court finds that supplementation of the administrative record is appropriate in this case to remedy those few instances where EPA considered evidence but failed to include it in the record. An Order consistent with this Opinion shall issue this same day.

SO ORDERED.

### *ORDER*

For the reasons stated in the Opinion issued this same day, it is hereby

---

9. The documents in question here are not all adverse to the agency's position as they were in *Public Citizen v. Heckler,* 653 F.Supp. 1229 (D.D.C.1986). In addition, the e-mails regarding lead as a PBT do not reveal a scientific community consensus the way that the memorandum in *Public Citizen* did. *See id.* at 1237–38 (supplementing the record with memorandum that definitively recognized the harm caused by raw milk). In this case, even those e-mails that can be considered adverse are not "indicative of a lack of rationality" by EPA since EPA acknowledges that the scientific community differs over the methodology and clearly considered these issues before finalizing the lead rule. *Id.* at 1237. Various internal EPA e-mails reflect both support for

and criticism of the agency's methodology and conclusions. *See* Pl.Ex. J9, J14 (stating that given the data available, lead certainly can be considered a PBT); Pl.Ex. J12 ("I did not hear any solid arguments that counteract our claim that Lead, Cadmium and their compounds are PBT chemicals, instead they attacked our scoring system. Perhaps our scoring system should not have handled metals the same way as organics, but please don't let their arguments end up throwing the baby out with the bath water."); Pl.Ex. J16 (providing scientific analysis and statistics disproving OMB arguments); Pl.Ex. J21 (stating that because the metal mercury was already listed as a PBT in an October 1999 final rule, the precedent for metals as PBTs is established).

ORDERED that plaintiffs' motion to supplement the administrative record is GRANTED in part and DENIED in part; it is

FURTHER ORDERED that defendants shall supplement the administrative record by filing copies of (1) the transcript from the "Experts Workshop," (2) the December 5, 2000 comments submitted by Jane Luxton relating to the August 23, 2000 meeting, and (3) the GAO report, *Regulatory Flexibility Act: Implementation in EPA Program Offices and Proposed Lead Rule;* and it is

FURTHER ORDERED that defendants shall re-certify the index after inclusion of the above-identified documents.

SO ORDERED.